SNYDER'S ADM'RS *v.* McCOMB'S EX'X.[1]

*(Circuit Court, D. Delaware.    July 3, 1889.)*

1. TRUSTS—DECLARATION—EVIDENCE.
    A. had made at B.'s request a declaration of trust of certain shares of stock in favor of C., stating in the declaration that it was in accordance with an "arrangement between A., B., and C." This arrangement was shown to relate to another matter. Afterwards, when pressed by C., A., while not repudiating the trust, asserted C.'s interest to be a qualified one, subject to B.'s debts. The evidence showed that, while A. may have considered his declaration a qualified one, it was not so treated by B. or C., and that C. refused to acquiesce in the statement that it was so. *Held,* that an absolute trust was established.

2. SAME—BAR BY LAPSE OF TIME.
    Where an express trust created by act of parties has been admitted by the trustee to exist, but with a qualification, there has been no adverse possession and the trust is not barred by lapse of time.

3. SAME—LIABILITY OF TRUSTEE.
    The trustee of certain shares of stock sold very advantageously other shares of the same stock standing in his own name, and transferred the trust stock to same parties without consideration. When urged subsequently by the *cestui que trust*, whom he had not informed of either transaction, to dispose of the trust stock, he, although in a position to know that its value would in a few days be only nominal, dissuaded him from selling, alleging its great value. *Held,* that the trustee was liable for want of full and faithful performance of trust, and that the *cestui que trust* was not compellable to receive worthless shares in satisfaction.

4. SAME—MEASURE OF LIABILITY—CORPORATION STOCK.
    A trustee, who has in bad faith prevented a sale of his trust stock while it was of value, is liable to his *cestui que trust*, in the absence of proof of market value of shares when the sale could have been made, and of the receipt of any dividends or interest by the shareholders for the amount paid in, with interest, from the time the trust was acknowledged.

5. SAME—CORPORATIONS—STOCK—EVIDENCE OF VALUE.
    A sale of stock under conditions, among others, that the vendor would receive it back at an advanced price, and offers to purchase and statements of value, intended evidently only to inflate the stock, are not evidences of value.

[1] Reported by Marks Wilks Collet, Esq., of the Philadelphia bar.

**6.** SAME—ACTION TO ENFORCE—RES ADJUDICATA.

An action had been brought by complainants' decedent against respondent's decedent in another court, on an alleged contract by the latter that, having in his hands $45,000 belonging to complainants' decedent, he would, on consideration of its not being then withdrawn, purchase a certain number of shares of a corporation for him with it, and, if at any time requested, would take back the shares and repay the money. The issues of fact being the existence of the contract, and of consideration therefor, and being negatived, *held*, that this action, though between privies of the present parties, was not for the same cause of action as a suit to enforce a trust, and that the complainants were net estopped by the doctrine of *res adjudicata.*

**7.** SAME.

The refusal of the court, in the former action, to exercise its discretion, conferred by legislature, and change the declaration into a bill in equity, the suit being dismissed without prejudice to entry of new suit to enforce the trust, the question here involved nowhere appearing, does not estop the complainants.

In Equity.

The bill states, in substance, that Henry S. McComb, in his life-time, held 800 shares, of the value of $1,000 each, in the Southern Railroad Association, as trustee for C. Brown Snyder, and that he failed to account for them, having converted them to his own use; and this suit is now brought to obtain a decree establishing the trust, and for the payment by the defendant of the value of the stock with its dividends, accretions, etc., including an order for an accounting. The history of the creation of the alleged trust is a very brief one.

On the 30th of June, 1868, an unincorporated company, called the "Southern Railroad Association," was formed by McComb and others, with a capital of $1,500,000. Among the subscribers to this capital were Henry S. McComb, for $415,000, Josiah Bardwell, for $100,000, and Henry S. McComb, trustee, for $60,000. The capital was soon afterwards increased to $2,000,000, and on January 14, 1869, the company was incorporated under its original name by an act of the legislature of Tennessee, and was organized under its charter on the 21st of the same month, with McComb as president. The following correspondence between Bardwell and McComb relates directly to, and contains the first acknowledgment of, the trust in favor of Snyder:

"*My Dear McComb:* Will you please acknowledge that you hold in 'the Southern Ass'n,' as trustee for [the benefit,] or, rather, for C. B. Snyder, that am't of stock wh. you held as for me, Mr. Snyder having two months since pd. me its cost and interest.

"Yours, truly,                    J. BARDWELL.
"*Boston, Nov.* 12, 1869."

"OFFICE OF H. S. McCOMB, WILMINGTON, DEL., Nov. 22, 1869.
"*Josiah Bardwell, Esq., care of F. Skinner & Co., Boston*—DEAR SIR: I send this (acknowledgment as trustee) the first leisure moment after the receipt of your letter, and if it is not in conformity with your wishes in any manner please return it to me with such instructions to be carried out as you shall see disposed to make.

"Yours, truly,                    H. S. McCOMB.    M."

The following is a copy of the paper inclosed in McComb's letter:

"*To whom it may concern:* I hereby acknowledge to hold in the Southern Railroad Association, as trustee for C. B. Snyder, under an arrangement with Josiah Bardwell, an original subscription of sixty thousand dollars, on which seventy per cent. has been paid. This notice is in conformity with an arrangement made some two months ago between Josiah Bardwell, C. B. Snyder, and myself.                    H. S. McCOMB, Trustee."

On this acknowledgment is a memorandum in Bardwell's handwriting, "Received Nov. 23, 1869."

*George Gray, Wm. C. Spruance,* and *Wm. G. Wilson,* for complainants.

*Bates & Harrington* and *Wayne McVeagh,* for defendant.

Before BRADLEY, Justice, and WALES, J.

WALES, J., (*after stating the facts as above.*) It is not denied that this acknowledgment by McComb, at the time it was made, created a trust of some sort in favor of Snyder, but it is claimed, on behalf of the defendant, that the right of Snyder to a beneficial interest in the trust stock was subject to prior liens or incumbrances for advances made by McComb to Bardwell which were far in excess of the value of the stock, both at and subsequent to the date of the acknowledgment; in other words, that Snyder's interest in the stock was a contingent one, depending on the payment of certain claims held by McComb against Bardwell, who was the original *cestui que trust,* and that these claims have never been paid. An issue of fact is thus presented which can be determined only by a review of the evidence; but, before entering upon any discussion of disputed facts, a preliminary statement of uncontroverted matters in the cause will materially shorten such discussion, and render it more intelligible. There is no evidence that McComb ever repudiated or disclaimed this declaration of trust. He did, however, when threatened with a suit, assert that Snyder's interest was only a qualified one, as before stated. The assessments on the subscription for the trust stock, as far as there is any evidence on that subject, were paid by Bardwell; and certificates Nos. 157 to 164, inclusive, for 800 shares, (increased from the original 600 by the increase of the capital of the association,) were issued to Henry S. McComb, trustee, October 6, 1870, and these shares stood in his name as trustee at the time of his death, December 30, 1881. On November 8, 1871, McComb sold and transferred 5,000 shares of the Southern Railroad Association, belonging to himself, to the Pennsylvania Company, at $125 per share, and on the same day transferred to the same company 5,000 other shares of the stock, including those standing in his name as trustee. Upon the face of the transaction the transfer of the second 5,000 shares was made without any money consideration, and solely for the purpose of giving to the Pennsylvania Company the controlling management of the association; but by the terms of his agreements with that company McComb parted with and surrendered the possession of the trustee stock for the time being. It was out of his possession at the time of his death, and was delivered to his executrix by the Pennsylvania Company at about the time of the beginning of this suit. It does not appear that any dividends were declared on the trust stock,

or that McComb derived any profit from its transfer to the company except that such transfer may have directly or indirectly enhanced the price he received for his own stock. The Southern Railroad Association was afterwards merged by consolidation in another company, ceased to have an independent existence after July 1, 1874, and thenceforward its stock had a nominal value only. The consolidated lines went into the hands of a receiver, and were sold by virtue of foreclosure proceedings on a mortgage. The original object of the association was to obtain, by lease or purchase, certain main lines of railroad between Chicago and New Orleans, and thus control a large, if not the principal, share of the business of transporting passengers and freight between those important cities, as well as between intermediate points. The scheme appeared to be feasible and attractive to the enterprising minds which conceived it, and to the men who united in its execution, but it failed by reason of causes not necessary here and now to relate.

Approaching the more debatable portion of the testimony, the first inquiry relates to the understanding, or "arrangement," which was had among themselves, by McComb, Bardwell, and Snyder, in reference to the trust stock. McComb and Bardwell, acting independently, and sometimes jointly, were large operators in railroad stocks and other securities, and their personal relations, judging from the letters that passed between them, were intimate and cordial. In the early part of 1869 they were concerned in a joint speculation in the stock of the Chicago & Rock Island Railroad Company, to which Bardwell contributed $45,000, and was to receive one-fourth of the profits after all the expenses had been deducted, as appears from the following receipt executed by McComb :

"APL. 22, 1869.

"Received, Boston, April 22, 1869, of J. Bardwell, his three drafts of $15,-000 each, 30, 40, and 50 days date, on Strang and Snyder, New York, being in payment of one-fourth interest in 10,000 share transaction in the stock of the Chicago and Rock Island Railroad Co., to be managed by John F. Tracy, as agreed between myself and said Tracy, through Smith, Randolph & Co., of New York, as brokers for the account of myself and Bardwell.

"H. S. McComb."

Annexed to this paper is the following memorandum :

"The three drafts mentioned in the foregoing receipt were paid by Strang and Snyder, and by them charged to my account on their books, after the transaction in the Chicago and Rock Island Railroad Company's stock was closed. The whole or no part of the money or interest was returned to me, but $42,000 was applied to the subscription to stock in the Southern Railroad Association, for which amount I hold H. S. McComb's receipt, as trustee, dated Nov. 23, 1869.                                                     C. B. SNYDER.

"*Boston, January* 23, 1870."

Assessments on the subscription to the trust stock were paid by Bardwell prior to McComb's acknowledgment, as follows:

| | | | |
|---|---|---|---|
| July 8, 1868. | 40 per cent. on $60,000, or | - - - - | $24,000 |
| Jan. 10, 1869. | 10 " " " " | - - - | 6,000 |

(Stock increased 33 per cent. or to $80,000.)

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Jan. 2, 1869. | 5 per cent. " | $80,000, " | - | - | - | - | $4,000 |
| March 2, 1869. | 5    "    " | "    " | - | - | - | - | 4,000 |
| Sept. 20, 1869. | 5    "    " | "    " | - | - | .. | - | 4,000 |

This statement shows that up to November, 1869, $42,000 had been paid on the trust stock, and corresponds with the acknowledgment of trust made by McComb. In reply to a letter dated October 25, 1873, written by E. F. Cutter to McComb, inquiring, "Are the interests of F. S. & C. in the Southern R. Rd. Association, on which you advanced 60 M., still intact, and are they worth the loan and principal? How does the 60 M. of Mr. Snyder's stand affected?" McComb wrote, two days later: "The South'n R. R. Association stands all right, and everybody's interest stands upright and square." Later on, on June 3, 1874, Snyder applied to McComb for $30,000, either by way of payment, on account, for the trust stock, or as a loan, with the suggestion that McComb could reimburse himself from the sale of consolidated bonds. Bardwell urged McComb to comply with Snyder's request, but McComb declined. It is evident, from the letters which passed between McComb and Bardwell and Snyder, at the time of this application, that both Bardwell and Snyder understood and believed that Snyder's interest in the trust stock was represented by $42,000, and that Snyder was entitled to at least that much of its value, without making any allowance for the claims of other parties. Being further pressed for money by Snyder, McComb wrote to him on July 21, 1874, that he (McComb) held the trust stock as collateral for advances made to Bardwell and F. Skinner & Co., "which advances more than cover all this stock." In the same letter, however, McComb offered to send Snyder $30,000 Southern Railroad Association paper, on condition that Snyder would surrender to him the written acknowledgment of the trust. Snyder replied to this that "F. Skinner & Co. never had any interest in the money you receipted to me for as trustee; neither had Mr. Bardwell, except that I agreed to share the profits of the transaction with him after receiving the principal and interest at 8 per cent. per annum; and it was as much to help him as myself that I asked you for an advance. I cannot entertain your offer for a moment, but I will assign my interest to parties who will take what they are entitled to; no more, no less." The statement of Snyder's account with F. Skinner & Co. is produced in confirmation of what Snyder had written to McComb:

"BOSTON, Novem. 20, 1874.

"C. B. Snyder, Esq.—DEAR SIR: On the 4th of August, 1869, we received the sum of $44,709.38, and paid as follows:

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| June 29, 1869, | - | - | - | - | - | - | $37,580 | 00 |
| Octo. 1,   " | - | - | - | - | - | - | 2,305 | 44 |
| Aug. 25, 1870, | - | - | - | - | - | - | 4,100 | 00 |
| | | | | | | | $43,985 | 44 |

—and Mr. Bardwell's note, due Sept. 2, 1870, for $4,172.58, lays under protest, as far as we know. The above receipt and payments being on account of your subscription to the Southern R. Rd. Association.

"Yours, truly,     EDM'D F. CUTTER, of F. Skinner & Co."

Towards the close of the year, 1869, Bardwell became financially embarrassed, although as late as September 15, 1869, McComb had written to him:

"The net of your account is $36,719.80, from which deduct payment of $2,500.00, leaving due you, and subject to call, $34,219.80. Shall I pay your trustee call S. R. R. A., due the 20th inst.?"

On November 18, 1869, Bardwell executed a power of attorney to transfer his own stock, 1,333 shares, in the association. The witnesses Cross and Marsh testify to conversations had at different times in the years, 1873, and 1874, between McComb and Snyder, in which McComb represented the stock of the association to be of great value, and advised Snyder not to part with his interest. Henry Mulliken, another witness for the complainants, acquired an interest in the association, in 1868, for $10,000, which eventually represented 174 shares of stock, for which McComb, in the spring of 1873, offered him $25,000, and in the autumn of the same year $17,000, both of which offers were declined.

The testimony for the complainants, of which a general outline has now been given, points to the conclusion that the acknowledgments of November, 1869, created an unqualified trust in favor of Snyder for at least the quantity of stock represented by $42,000; nor is there any evidence to the contrary, excepting the unsupported statements of McComb, which were founded on a misapprehension by him of his arrangement with Bardwell and Snyder. A court of equity would hesitate to enforce a declaration of trust, absolute on its face, if it was intended by the declarant, with the knowledge and consent of the *cestui que trust*, that the interest of the beneficiary was a qualified one, and subject to well-understood contingencies; but here there does not appear to be a reasonable doubt that Bardwell and Snyder believed that Snyder was to be the beneficiary of the trust stock for the amount of money which he had paid Bardwell for it, without qualification, and the expressions used by McComb, in declaring the trust, import the same thing. Col. McComb was a man of superior intelligence and capacity, possessed of a large experience, acquired in the management of extensive business operations of different kinds, and was fully competent to protect his own interests on all occasions; and if he failed, in this instance, in making this declaration of trust, to guard against the loss of a collateral security, while he may have deceived himself, his fault or mistake cannot be allowed to deprive an innocent person of his rights. Bardwell requested him to "acknowledge that you hold in the Southern Assn., as trustee for [the benefit,] or rather, for C. B. Snyder, that amt. of stock wh. you held as for me, Mr. Snyder having two months since pd. me its costs and interest." McComb, in sending the required acknowledgment, wrote to Bardwell that "if it is not in conformity with your wishes in any manner, please return it to me with such instructions to be carried out as you shall see disposed to

make." It will be observed that Bardwell made no allusion to any previous bargain or arrangement, but asked for a simple acknowledgment, which McComb made in his own way, but proposed to put it in any other form that Bardwell might direct. The death of Bardwell, in October, 1875, has deprived both parties to the present suit of his evidence on this matter, except what may be gleaned from his letters to McComb; and what he thought of the nature of Snyder's interest in the trust stock may be seen from one of those letters, dated June 24, 1874, in which he wrote:

"*Dear General McComb:* I make transcript of memorandum for Snyder's benefit, undertaking to carry out myself the verbal agreement I made with you: 6 notes for $5,000 each, Southern Railroad Association, 4 mos., and 2 for $5,000 each, your indorsement, you to have the $42,000 Snyder's as col. security, and I will send you the satisfactory papers. I think you will send them to my care for Snyder * * *.          Truly yours,          J. B."

This does not look as if Bardwell believed that Snyder's interest was subject to any lien or incumbrance, or he would hardly have proposed to McComb to accept the trust stock as collateral security for further advances. The reading of the whole correspondence prompts several questions. Why should a capable and experienced man like Col. McComb have made a declaration of trust, for the benefit of Snyder, in property which was already held by McComb as collateral security for more than it was worth? Did McComb and Bardwell contrive to deceive Snyder, by luring him into the belief that the money which he had lent to Bardwell was safely secured by its investment in the trust stock? Or did McComb endeavor to allay all suspicion on the part of Bardwell and Snyder by writing to Bardwell that, if the form of the acknowledgment was not entirely satisfactory, he would reform it in any manner to please Bardwell? To answer these questions consistently with the theory of the defense, that Snyder's interest was only a contingent one, would, in the light of all the testimony, reflect unfavorably on the intelligence or on the good faith of McComb. There is no impenetrable mystery about this trust. The only trouble is that all the persons who were closely connected with and interested in the business are not here to explain some of the minor details, but, looking at the facts contained in the evidence and spread on the record of the case, there is sufficient proof to establish the trust as set forth in the bill of complaint.

Having disposed of this branch of the defense, there remain to be considered the plea of the statute of limitations, and the defense of *res adjudicata.* It may be sufficient to say that, as between a trustee and his *cestui que trust,* an express trust, created by the act of the parties themselves, will not be barred by any length of time, for, in such cases there is no adverse possession, the possession of the trustee being the possession of the *cestui que trust.* This is elementary law, not without modifications, it is true, but none of which are applicable to the present case. Hill, Trustees, 264, and the cases there cited; *Prevost* v. *Gratz,* 6 Wheat. 497; *Decouche* v. *Savetier,* 3 Johns. Ch. 216; *Goodrich* v. *Pendleton,* Id. 390. As already seen, there never was any disclaimer of the trust by McComb. He ad-

mitted it, with a qualification; and no statute has been referred to by which a trust, when once created, is barred by lapse of time. In fact this defense was not insisted on in the argument.

But it was urged, with much ingenuity and with an imposing array of authorities, that the matters now in dispute between the respective representatives of McComb and Snyder have already been passed upon by a court of competent jurisdiction, and are therefore *res adjudicata*, and are not now subject to be reviewed and decided anew by this court. To sustain this defense evidence has been introduced of two separate actions instituted by Snyder against McComb, to recover the money which Snyder advanced to Bardwell, and which went into the trust stock in the hands of McComb. The first action was brought in the supreme court of the state of New York, June 25, 1875, and was discontinued, January 19, 1876. The second action was begun, October 26, 1875, in the supreme judicial court of Massachusetts, was heard by that court without a jury, and resulted in a judgment in favor of the defendant, December 23, 1878. The amended declaration in the Massachusetts action set forth that in July, 1869, the defendant having in his hands the sum of $45,000 belonging to the plaintiff, promised the plaintiff, for the consideration of leaving this money in defendant's hands, that he would purchase therewith a number of shares in the capital stock of the Southern Railroad Association, and would cause certificates for said shares to be issued to the plaintiff and to be delivered to him, and, further, that he would at any time, when requested, take the said shares from the plaintiff and pay him the sum of $45,000, with interest at the rate of 7 per cent. The declaration further complains that, relying on the defendant's promises, the plaintiff allowed the defendant to retain the sum of $42,000, but that the defendant neglected to purchase the stock or to perform his promises, etc. The issues of fact tried in that case were whether the plaintiff and defendant therein made the contract declared on, and whether there was any consideration for such a contract. The defendant's counsel negatived both these propositions, and relied on the acknowledgment of trust to disprove the contract, contending that an action at law would not lie on such a paper, because the only scope and effect of such acknowledgment were to create a trust, for the enforcement of which a remedy must be had in equity. Before judgment was rendered, a motion was made on behalf of the plaintiff to convert the declaration into a bill in equity, under the provisions of a Massachusetts statute which authorized the supreme judicial court of that state to change a suit at law into a proceeding in equity, at the discretion of the court, if such change be necessary to enable the plaintiff to sustain the action for the cause for which it was intended to be brought. The court denied the motion, presumably on the ground that the action at law had no relation to the establishment of a trust; but, whether such was the reason or not, the court exercised its discretion in refusing the motion, without prejudice to the right of the plaintiff or to his representatives to bring an independent suit in equity to enforce the trust and compel its proper execution. The opinion of the court makes no part of the record of the judgment, and it nowhere ap-

pears that the question involved in the present suit was considered or de-cided by that court. Much testimony was given on the trial by McComb and Snyder, but their testimony was in relation to the existence of the contract between them as declared on, and not for or against the estab-lishment of a trust, which is the issue made by the bill and answer in the cause now before this court. Moreover, at the time of the trial in Mass-achusetts, Snyder was ignorant of important facts which are vital to the support of the present suit, and which were not discovered until after his death, particularly of the transfer of the trust stock to the Pennsylvania Company, in 1871, and of the profitable sale of McComb's own shares at the same time; nor had he knowledge of the value of these shares, which were not quoted in the stock exchange, or placed on the market for sale. *Res adjudicata* cannot be pleaded as a technical estoppel, or be introduced in evidence as conclusive, *per se*, except where there is both identity of parties and identity of cause of action. The rule laid down in the *Duchess of Kingston's Case*, 2 Smith, Lead. Cas. (8th Ed.) pt. 2, p. 785, is the accepted law on this subject, "that the judgment of a court of concurrent jurisdiction, directly upon the point, is, as a plea, a bar, or as evidence, conclusive between the same parties, upon the same matter, directly in question in another court." The same parties who were liti-gants in the Massachusetts case are represented here by their privies in law; but here the cause of action and the thing sued for are different. In the former case the cause of action was an alleged contract; here, the object of the suit is to establish a trust. The acknowledgment of the trust, which is the basis of the present suit, was used to defeat the action on the contract. It thus becomes perfectly clear that the former judgment cannot, under these circumstances, be pleaded, or used, to bar or estop the complainants. The applicability of *res adjudicata*, as a plea or bar, is well explained in *Cromwell* v. *County of Sac*, 94 U. S. 351, where the court say:

"In all cases, therefore, where it is sought to apply the estoppel of a judg-ment rendered upon one cause of action to matters arising in a suit upon a different cause of action, the injury must always be as to the point or question actually litigated and determined in the original action; not what might have been litigated and determined. Only upon such matters is the judgment con-clusive in another action."

In determining the amount for which a decree should be entered, it must be remembered that Snyder, during his life-time, never claimed more than the sum of $42,000, that also being the amount which Mc-Comb acknowledged to have been paid on the trust stock at the time he made the acknowledgment, and there is no proof that Snyder paid any assessments after that. It has not been shown that the stock had an as-certained market value, or that the holders of it received any dividends or interest. The sale by McComb to the Pennsylvania Company was made on certain conditions, among which was one that he would, at the expiration of two years from the day of sale, if requested, take the stock back at an advanced price; and his statements of its value, in the pres-ence of Snyder and others, were made rather to inflate the stock by giv-

ing it a fictitious price, than to name a figure at which he would be willing to purchase. He, however, had the use of the money which belonged to Snyder by the assignment of Bardwell. It went into his estate, and has not been accounted for, he having always refused or evaded an accounting, and it is only equitable that it should be restored with interest.

BRADLEY, Justice. I concur entirely with Judge WALES in the opinion just delivered. There is no question but that McComb held the stock in trust for Snyder. The declaration of trust executed on the 22d of November, 1869, is conclusive on this subject; and it is absolute, having no qualification whatever. The words are:

"I hereby acknowledge to hold in the Southern Railroad Association, as trustee for C. B. Snyder, under an arrangement with Josiah Bardwell, an original subscription of sixty thousand dollars, on which seventy per cent. has been paid. This notice is in conformity with an arrangement made some months ago between Josiah Bardwell, C. B. Snyder, and myself."

Whatever may have been the conditions and qualifications of the trust existing while Bardwell had the beneficial interest, none are claimed in this declaration as between McComb and Snyder. The plea that it was to be held by McComb as collateral is an after-thought. No such idea was put forward until several years after the declaration of trust was executed. In all the conferences that took place between McComb and Snyder about the stock, down to July, 1874, the former never suggested that he held it as collateral, or that he had any claim on it. Collateral to what? The pretense now is that it was to be collateral to the debts that Bardwell, the original *cestui que trust*, owed to McComb. Then why was not that condition expressed in the declaration of trust given to Snyder? No reservation of any such right was made or hinted at. Besides, what debts of Bardwell was it to be collateral for? All the debts that he might ever owe to McComb? Or only those which were due when the stock was subscribed for? The vagueness of the claim, as stated by McComb himself in his testimony, is strongly presumptive against it. What evidence is there that Bardwell owed a dollar to McComb at the time of the latter's death? It seems to me that this claim to hold the stock as a collateral paramount to the interest of Snyder as *cestui que trust* is unsupported by any sufficient proof. Assuming that the trust was an absolute one, it is clear that the stock has never been accounted for to Snyder or to his estate. The transaction in Chicago & Rock Island stock, in the spring and summer of 1869, does not affect the case in the least, except as being the occasion, perhaps, on which Snyder advanced the money to Bardwell in consideration of which the latter transferred all his interest in the trust stock to Snyder. Besides, this transaction had all passed before the declaration of trust was executed. The relation, then, of trustee, pure and simple, being established against McComb, how can his conduct be excused? In November, 1871, he sold his own stock in the Southern Railroad Association to the Pennsylvania Company for $125 per share, under agreement, it is true, to repurchase it at an advance at the end of two years, at the option of the Pennsylvania Company,—an op-

tion which we do not learn was ever exacted of him. While thus advantageously disposing of his own stock, he did nothing of the kind with that which he held in trust for Snyder, and gave Snyder no notice or information of what he had done with his own, but urged him and persuaded him against his wishes to let the stock held in trust remain as it was, alleging that it was very valuable, was worth twice its par value, and was a first-rate investment. Nor did he inform Snyder that, in his deal with the Pennsylvania Company, he had actually handed over the trust stock to that company to enable them to have full control of the operations in prospect. In June, 1874, Snyder was hard pushed for money, and desired to dispose of the trust stock, and applied to McComb for that purpose. The latter urged him to keep it, and to put more money into the concern; said that it was a good thing, worth two for one, and all that, never mentioning the fact that the stock was then out of his hands, and in possession of the Pennsylvania Company. This was in June, and yet, on the 1st of July of the same year, the Southern Railroad Association was merged into another company, which assumed its obligations, it is true, but left its stock out in the cold. McComb himself testified that since that day the stock had had only a nominal value. From the large share of control which McComb had in the affairs of the company it cannot be conceived possible that he was not fully aware of the changes to be made, at the very time when he was persuading Snyder to hold on to the stock. It seems to me that there was not a faithful execution of the trust on the part of McComb. He was in a situation to know everything that affected the value of the stock. He was one of the managers and manipulators, if not the principal manager, of the affairs of the association. He was on the inside, and, having such knowledge as this position gave him, he was bound to exercise entire frankness and good faith towards his *cestui que trust*. Instead of doing this, he kept up false appearances, gave glowing views of the value of the stock, discouraged every attempt to dispose of it, or to change it for something else, kept secret the disposition of his own stock, and induced Snyder to believe that the prospects of the association were of the most promising character. However free from liability he may have been towards other stockholders, I think the course he pursued was unjustifiable, to say the least, in relation to Snyder, for whom he was trustee.

I concur with Judge WALES in the opinion that the estate of McComb is liable to the complainants for the want of a full and faithful fulfillment of the trust on the part of Mr. McComb. I also agree that, in the absence of satisfactory proof of the value which the stock had during the period from 1870 to 1874, when it could have been advantageously disposed of, and when Snyder desired to dispose of it, but was prevented from so doing by the representations of McComb, the amount paid upon it, with interest, is the most equitable and satisfactory award of compensation that can be made. It would be no relief at all to the complainants to give them a decree for the specific stock. That has long ceased to have any value. The complainants contend that they ought to be allowed the same price which McComb realized for his own stock in

disposing of it to the Pennsylvania Company, to-wit, $125 per share. But that price is not a fair criterion of its value at the time. The sale was incumbered with an agreement to take the stock back at an advanced price, at the end of two years, if the Pennsylvania Company should so desire. Sales of this kind, in which the purchaser incurs no hazard, are often effected at fancy prices, and stock is subscribed which the party would never think of taking on his own responsibility and hazard. Besides, another agreement, made at the same time, shows that the transaction was not so much a sale as the joinder of stocks by McComb and the Pennsylvania Company for purposes of mutual profit. I also agree that the offers made by McComb from time to time for portions of the stock are but slight proof of its value. He never purchased at those offers, and in one case, where the party a few days afterwards concluded to accept his offer, McComb replied that it was not an open one, and declined to take the stock. I think, with Judge WALES, that those offers were made to satisfy the holders of the stock that it was their interest to keep it. The plea of the statute of limitations, set up by the defendant, does not lie in this case. It is a case of pure trust, subsisting to this hour, and not denied. Had the trust been repudiated, the statute might have run from the time of such repudiation; but it has never been repudiated. The relief sought by the *cestui que trust* is not a legal demand, but a purely equitable one, namely, recompense for a deterioration or unlawful disposition of the trust-estate by the fault of the trustee, and an account of the proceeds or value thereof. The statute of limitations is no defense in such a case. Great lapse of time and unreasonable delay might be; but the present suit is not amenable to that charge. Sufficient reason is shown for any delay that has occurred. The secrecy observed by McComb in his transactions with the Pennsylvania Company, and the ignorance in which Snyder and his representatives were kept, are a sufficient answer to the charge of laches and unreasonable delay. The plea of *res judicata* is equally untenable. Snyder sued McComb in an action at law upon an alleged agreement to take the stock off his hands at any time. That was the only issue tried. It was decided against Snyder. The mere statement is sufficient to show that the question in that case was very different from the question in the present case. The decision simply settled the point that McComb did not make any such agreement. It did not affect the trust on which this suit is based, nor the breach of trust which forms its *gravamen*.

Let a decree be made for the complainants against the defendant for the sum of $42,000, with interest at 6 per cent. per annum from the 23d day of November, 1869, the date of the declaration of trust.